## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG |
| | **This Document Relates to *Bell et al v. 3M Company et al*, 2:18-cv-03366-RMG** |

| | |
|---|---|
| GREGORY BELL; JOSE ACEVEDO; and DENISE DURBIN, individually and as parent and next friend of K.D. and B.D.; for themselves and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>-*vs*-<br><br>THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., AGC CHEMICALS AMERICAS INC., AMEREX CORPORATION, ANGUS INTERNATIONAL SAFETY GROUP, LTD., f/k/a Eurostar Holdco Limited, ARKEMA INC., individually and as successor in interest to Atofina S.A., ARCHROMA MANAGEMENT LLC, BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER GLOBAL CORPORATION, individually and as successor in interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS INC., CHEMGUARD INC. CHEMICALS, INC., CLARIANT CORPORATION, individually and as successor in interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DUPONT DE NEMOURS INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, DYNAX CORPORATION, E. I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, JOHNSON CONTROLS INTERNATIONAL PLC, KIDDE-FENWAL, INC., individually and as successor in interest to Kidde Fire Fighting, Inc., NATION FORD CHEMICAL COMPANY, NATIONAL FOAM, INC., THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, LLC, | **FIFTH AMENDED CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

| individually and as successor in interest to DuPont | ) |
| Chemical Solutions Enterprise, and TYCO FIRE | ) |
| PRODUCTS, LP, individually and as successor in interest | ) |
| to The Ansul Company, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

Pursuant to Case Management Order No. 3D, Plaintiffs GREGORY BELL, JOSE ACEVEDO, DENISE DURBIN, individually and as parent and next friend of K.D. and B.D., DAVID BELL, DEANNE LOPEZ, ROSE FRANCIS, JUDY BARSTAD, YVONNE STRACHAN, LORENCIO ATCHLEY, PATRICIA ATCHLEY, CAROL FLATHERS, WALTER GALE, PENNIE GALE, MARILYN BENNETT, PHYLLIS TAYLOR, DONALD TAYLOR, MARNELLO BODDIE, JANET BAHNER, and MARY NIEMETZ, by and through their undersigned counsel, hereby file this Fifth Amended Class Complaint, individually, and on behalf of all others similarly situated, with individual claims, and make these allegations based on information and belief against Defendants 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., AGC CHEMICALS AMERICAS INC., AMEREX CORPORATION, ANGUS INTERNATIONAL SAFETY GROUP, LTD., f/k/a Eurostar Holdco Limited, ARKEMA INC., ARCHROMA MANAGEMENT LLC, BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER GLOBAL CORPORATION, CHEMDESIGN PRODUCTS INC., CHEMGUARD INC. CHEMICALS, INC., CLARIANT CORPORATION, CORTEVA, INC., DEEPWATER CHEMICALS, INC., DUPONT DE NEMOURS INC., DYNAX CORPORATION, E. I. DUPONT DE NEMOURS AND COMPANY, JOHNSON CONTROLS INTERNATIONAL PLC, KIDDE-FENWAL, INC., NATION FORD CHEMICAL COMPANY, NATIONAL FOAM, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, and TYCO FIRE PRODUCTS LP (collectively "Defendants"):

# INTRODUCTION

1.     The communities of Fountain, Security, and Widefield (collectively the "Communities") are all located south of Colorado Springs, Colorado.

2.     The Communities are located in close proximity to and downgradient of Peterson Air Force Base and the Colorado Springs Municipal Airport, which share one property.

3.     The United States Air Force ("USAF") provided firefighting services to the Colorado Springs Municipal Airport, owned by the City of Colorado Springs through a joint use agreement.  For purposes of this Complaint, the property of Peterson Air Force Base shall include the property of the Colorado Springs Municipal Airport and shall collectively be referred to as "PAFB."

4.     Residents of the Communities receive their potable water either from private wells or from their municipal water provider.

5.     The Communities receive municipal drinking water from the City of Fountain Utilities Department, the Security Water and Sanitation District, and the Widefield Water and Sanitation District.

6.     The Security Water and Sanitation District provides drinking water to approximately 19,000 residential and business customers.

7.     The City of Fountain Utilities Department provides drinking water to approximately 29,000 customers.

8.     The Widefield Water and Sanitation District provides drinking water to approximately 16,000 customers.

9.      On May 2, 2012, the United States Environmental Protection Agency ("USEPA") published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015.

10.     As part of the UCMR3, public water systems are required to sample for six perfluorinated compounds ("PFCs"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS").

11.     In October 2015, the USEPA released results from UCMR3 that indicated the Communities' water supplies were contaminated with PFOA and PFOS.

12.     However, there was no notification to the residents of the Communities that the water was contaminated with PFOA and PFOS.

13.     In May 2016, the USEPA established a drinking water health advisory level for PFOA and PFOS and warned that lifetime exposure to PFOA and PFOS over 70 parts per trillion ("ppt") was linked to the development of numerous serious medical conditions.

14.     In response to the USEPA's establishment of the 70 ppt health advisory level, the Communities' municipal water providers notified the residents in the Communities of the contamination and took action to reduce the PFOA and PFOS levels in the drinking water, including shutting down wells, obtaining and/or purchasing alternative sources of water, and blending clean water with the contaminated water to lower the PFC level in their customers' water.

15.     It was in this same month that Plaintiffs and the Putative Class were first made aware that their drinking water was contaminated with PFCs at hazardous levels and were advised to seek alternate drinking water supplies.

16.     Among the 63 areas nationwide where the USEPA found PFOA and PFOS exceeding the 70 ppt limit, federal data shows that the Communities exhibit some of the highest levels of contamination.[1]

17.     By this time, local newspapers were reporting that federal data showed that the water in all 32 of the Security Water and Sanitation District's municipal wells exhibited PFC contamination at levels exceeding the EPA health advisory limit of 70 ppt. At one well, PFC concentration reached 1,370 ppt, nearly 20 times in excess of the EPA health advisory.[2]

18.     EPA officials recommended that pregnant women and small children should not drink local water serving the Communities.[3]

19.     Subsequent investigations into the contamination were carried out by the United States Army Corps of Engineers on behalf of the USAF and the Colorado Department of Public Health & Environment ("CDPHE") and have uncovered widespread PFC contamination of the groundwater resources for the Communities.[4]

20.     These investigations also concluded that the basis for this widespread contamination of the Communities' ground water is decades of use, storage, and disposal of aqueous film-forming foam ("AFFF") at PAFB that contained PFOA and PFOS.

---

[1] Bruce Finley, *Drinking water in three Colorado cities contaminated with toxic chemicals above EPA limits*, DENVER POST, (June 15, 2016 4:08 PM), http://www.denverpost.com/2016/06/15/colorado-widefield-fountain-security-water-chemicals-toxic-epa/.
[2] *Id.*
[3] *Id*.
[4] U.S. Army Corps of Engineers, *Revised Final Preliminary Assessment Report for Perfluorinated Compounds at Peterson Air Force Base El Paso County, Colorado*, (November 2016), http://www.peterson.af.mil/Portals/15/documents/Public%20Notices/552503_Revised%20Final%20Peterson%20AFB%20PA_11_2016.pdf?ver=2017-05-16-162140-693.

21.     The CDPHE horizontally delineated the PFC plumes, designating these plumes as "Areas of Investigation" ("CDPHE Areas of Investigation").

22.     Defendants manufactured, sold, and distributed AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluorinated chemicals ("PFCs") contained in AFFF (collectively, "AFFF/Component Products") to PAFB, knowing that AFFF/Component Products containing PFOA and/or PFOS presented an unreasonable risk to human health and the environment and was inherently dangerous.

23.     The Defendants also knew that both PFOA and PFOS were highly soluble and mobile in water, highly likely to contaminate water supplies, highly persistent in the environment, and known to bioaccumulate in humans and contribute to the development of numerous serious health conditions, especially for sensitive receptors such as young children and pregnant and nursing women.

24.     The Defendants marketed and sold their products with knowledge that the USAF and PAFB would use large quantities of AFFF containing PFOA and PFOS in training operations and in emergency fire-fighting situations at military bases and airports in such a manner that PFOA and PFOS would contaminate the air, soil, and groundwater.

25.     The Defendants marketed and sold their products with knowledge that large quantities of AFFF containing PFOA and PFOS would be stored in fire suppressant systems and tanks on USAF Bases and at airports, including PAFB, and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the air, soil, and groundwater.

26.     The Defendants failed in their duty to manufacture a product that would not cause widespread harm and in their duty to warn the United States Department of Defense ("DOD"), the USAF, PAFB, the municipal water providers, and the residents in the surrounding Communities of the inherently dangerous properties of their AFFF/Component Products.

27.     The Putative Class represents over 64,000 residents of Fountain, Security, and Widefield who were exposed to PFOA- and PFOS- contaminated drinking water from the City of Fountain, the Security Water and Sanitation District, the Widefield Water and Sanitation District, and private wells, all of which obtain groundwater from the CDPHE Areas of Investigation.

**Health Effects of PFOS and PFOA Exposure**

28.     Scientific studies of PFOA and PFOS and have concluded that exposure to PFOA and PFOS is associated with the development of numerous serious medical conditions.

29.     PFOA, sometimes identified as C8 due to the common presence of eight carbons in the PFOA molecule, was the subject of a study formed out of a class action settlement arising out of water contamination from DuPont's Washington Works located in Wood County, West Virginia.

30.     The C8 Science Panel consisted of three epidemiologists specifically tasked with determining whether there was a link between PFOA exposure and human diseases.

31.     In 2012, the Panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

32.     In May 2015, based on concerns about the production and release of PFOA into the environment, scientists and other professionals from a variety of disciplines issued the "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)," a policy statement calling for greater

regulation, restrictions, and limits on the manufacture and handling of any product containing PFOA, as well as the development of safe, non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[5]

33.     In May 2016, the USEPA issued Lifetime Health Advisories advising against lifetime PFOA and PFOS exposure above 70 ppt.

34.     The USEPA's 70 ppt limit is designed to protect the population at large from exposure to harmful concentrations of PFOA and PFOS in drinking water above which adverse health effects are anticipated to occur.[6]

35.     According to the USEPA Lifetime Health Advisory, the adverse health effects observed following exposure to PFOS are the same as those observed with PFOA.

36.     Many states, however, have issued lower regulatory limits.  For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level of 14 ppt for PFOA.

37.     In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects

---

[5] Arlene Blum et al., Brief Communication, *The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)*, 123 Env't Health Perspectives A107, A107-11 (2015), http://dx.doi.org/10.1289/ehp.1509934.
[6] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016).

human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[7]

38.     The IARC concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[8]

39.     On November 10, 2017, California listed PFOA and PFOS as chemicals known to the state to cause reproductive toxicity, pursuant to Proposition 65, The Safe Drinking Water and Toxic Enforcement Act of 1986.

40.     In November 2017, Congress passed the National Defense Authorization Act ("NDAA"), legislation which set aside $42 million to remediate PFOA and PFOS contamination from military bases.  As part of the NDAA, an additional $7 million was devoted to the Investing in Testing Act, which authorizes the Centers for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.

41.     Colorado currently follows the USEPA Lifetime Health Advisory level of 70 ppt for combined lifetime exposure to PFOA and PFOS.

### Plaintiff's and the Putative Class' Exposure and Damages

42.     Years of ingestion and dermal absorption of contaminated water from the Fountain, Security, and Widefield water districts have significantly exposed unknowing residents of the Communities to PFCs at concentrations hazardous to their health.

---

[7] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.
[8] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

43.     Plaintiffs and the Putative Class have been injured as a result of receiving and/or consuming water with elevated levels of PFCs, including PFOA and PFOS, for years.

44.     Plaintiffs and the Putative Class have been injured due to PFC contamination of the municipal and private water supplies caused by Defendants' manufacture, distribution, and sale of AFFF/Component Products.  Their injuries include significant exposure to elevated levels of PFCs putting them at an increased risk of contracting serious latent diseases, bioaccumulation of PFCs in their blood, personal injury, property damage, and the diminution of property values.

45.     The properties of the Plaintiffs and the Putative Class have been damaged due to the presence of PFCs in their homes, soil, surrounding property, and potable water supply.

46.     Plaintiffs and the Putative Class seek recovery from all Defendants for injuries, damages, and losses suffered by the Plaintiffs, each of whom suffered injuries as a direct and proximate result of exposure to and consumption of PFC-contaminated water from the municipal and private drinking water supplies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

## JURISDICTION AND VENUE

47.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1) and (d)(2) in that this action is between citizens of different States and seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs, and attorneys' fees .

48.     This Court has jurisdiction over Defendants pursuant to C.R.S. § 13-1-124.

49.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the District of Colorado and caused harm to Plaintiffs and the Class Members, all of whom reside in this District.

## THE PARTIES

### Class Representatives with Individual Personal Injury and Property Damage Claims

50.     Plaintiff Deanne Lopez is a resident of Colorado Springs, Colorado, who currently resides at 776 Kisker Court, Colorado Springs, Colorado 80911.  She is the owner of the property and currently receives water from a municipal well owned by the Security Water and Sanitation District.  PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Deanne Lopez has been exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Deanne Lopez has been diagnosed with pregnancy problems, miscarriages, and reproductive problems, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

51.     Plaintiff Rose Francis is a resident of Colorado Springs, Colorado, who currently resides at 4040 Sinnes Drive, Colorado Springs, Colorado 80911.  She is the owner of the property and currently receives water from a municipal well owned by the Security Water and Sanitation District.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Rose Francis has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Rose Francis has been diagnosed with kidney problems, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in

thyroid hormone, and kidney cancer.

52. Plaintiff Judy Barstad is a resident of Colorado Springs, Colorado, who currently resides at 7555 Sunny View Lane, Colorado Springs, Colorado 80911. She is the owner of the property and currently receives water from a municipal well owned by the Widefield Water and Sanitation District. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Judy Barstad has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Plaintiff Judy Barstad has been diagnosed with kidney disease, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

53. Plaintiff Yvonne Strachan is a resident of Colorado Springs, Colorado, who currently resides at 7192 Cliffrose Drive, Colorado Springs, Colorado 80911. She is the owner of the property and currently receives water from a municipal well owned by the Widefield Water and Sanitation District. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Yvonne Strachan has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Yvonne Strachan has been diagnosed with pregnancy problems, and is at a significantly increased risk of developing serious latent, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

54.     Plaintiff Patricia Atchley is a resident of Colorado Springs, Colorado, who currently resides at 8102 Silver Glen Drive, Fountain, Colorado 80817.  She owns the property with her husband Lorencio Atchley.  They currently receive water from a municipal well owned by the City of Fountain Utilities Department. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Patricia Atchley has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Patricia Atchley has been diagnosed with thyroid disease, and is at a significantly increased risk of developing serious latent diseases , including but not limited to effects on the liver and immune system, high cholesterol levels, and kidney cancer.

55.     Plaintiffs Walter Gale and Pennie Gale are residents of Colorado Springs, Colorado, who currently reside at 35 Monk Street, Colorado Springs, Colorado 80911.  They own the property and currently receive water from a municipal well owned by the Widefield Water and Sanitation District.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiffs Walter Gale and Pennie Gale have been significantly exposed to elevated levels of PFCs and have a bioaccumulation of PFCs in their blood.

56.     As a result of exposure to PFOA and PFOS in the contaminated water supply, Walter Gale has been diagnosed with thyroid disease and ulcerative colitis.   Walter Gale is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, and testicular and kidney cancer.

57.     As a result of exposure to PFOA and PFOS in the contaminated water supply,

Pennie Gale has been diagnosed with thyroid disease, high cholesterol, and kidney disease. Pennie Gale is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system and kidney cancer.

58.     Plaintiff Marilyn Bennett is a resident of Fountain, Colorado, who currently resides at 222 Oriole Street, Fountain, Colorado 80817.  She is the owner of the property and she currently receives water from a municipal well owned by the City of Fountain Utilities Department.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Marilyn Bennet has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood.  As a result of exposure to PFOA and PFOS in the contaminated water supply, Marilyn Bennett has been diagnosed with high blood pressure, thyroid abnormalities, ulcerative colitis, high cholesterol, and kidney disease, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and kidney cancer.

59.     Plaintiffs Phyllis Taylor and Donald Taylor are residents of Colorado Springs, Colorado, who currently reside at 5185 Almont Avenue, Colorado Springs, Colorado 80911. They own the property and currently receive water from a municipal well owned by the Security Water and Sanitation District.  PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.   Plaintiffs Phyllis Taylor and Donald Taylor have been significantly exposed to elevated levels of PFCs and have a bioaccumulation of PFCs in their blood.

60.     As a result of exposure to PFOA and PFOS in the contaminated water supply,

Phyllis Taylor has been diagnosed with high blood pressure, high cholesterol, and thyroid disease and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system and kidney cancer.

61. As a result of exposure to PFOA and PFOS in the contaminated water supply, Donald Taylor has been diagnosed with high blood pressure and high cholesterol, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and testicular and kidney cancer.

62. Plaintiff Marnello Boddie is a resident of Security, Colorado, who currently resides at 5465 Espano Drive, Security, Colorado 80911. She is the owner of the property and currently receives water from a municipal well owned by the Security Water and Sanitation District. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Marnello Boddie has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Marnello Boddie has been diagnosed with high blood pressure, thyroid disease, and pregnancy problems, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

63. Plaintiff Janet Bahner is a resident of Colorado Springs, Colorado, who currently resides at 7450 Caballero Avenue, Colorado Springs, Colorado 80911. She is the owner of the property and she currently receives water from a municipal well owned by the Widefield Water and Sanitation District. PFCs have entered the property and soil, including but

not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Janet Bahner has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Janet Bahner has been diagnosed with high cholesterol, high blood pressure, pregnancy problems, and asthma, and is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, changes in thyroid hormone, and kidney cancer.

64.     Plaintiff Mary Niemetz is a resident of Colorado Springs, Colorado, who currently resides at 112 Steven Drive, Colorado Springs, Colorado 80911. She is the owner of the property and she currently receives water from a municipal well owned by the Security Water and Sanitation District. PFCs have entered the property and soil, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Mary Niemetz has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Mary Niemetz has been diagnosed with irritable bowel syndrome, hypothyroidism, high blood pressure, and high cholesterol, and is at a signficantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system and kidney cancer.

### Class Representatives without Individual Personal Injury Claims

65.     Plaintiff David Bell is a resident of Colorado Springs, Colorado, who currently resides at 4140 Chenango Drive, Colorado Springs, CO 80911. He is the owner of the property and he currently receives water from a municipal well owned by the Security Water and Sanitation District. PFCs have entered the property and soil, including but not limited to through the

accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff David Bell has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in his blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, David Bell is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and testicular and kidney cancer.

66.     Plaintiff Carol Flathers is a resident of Fountain, Colorado, who currently resides at 11945 Orleans Road, Fountain, Colorado 80817. She is the owner of the property and she currently receives her water from a private well. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Carol Flathers has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in her blood. As a result of exposure to PFOA and PFOS in the contaminated water supply, Carol Flathers is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and kidney cancer.

67.     Plaintiff Lorencio Atchley is a resident of Colorado Springs, Colorado, who currently resides at 8102 Silver Glen Drive, Fountain, Colorado 80817. He owns the property with his wife Patricia Atchley. They currently receive water from a municipal well owned by the City of Fountain Utilities Department. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Lorencio Atchley has been significantly exposed to elevated levels of PFCs and has a bioaccumulation of PFCs in his blood. As a result of exposure to PFOA

and PFOS in the contaminated water supply, Lorencio Atchley is at a significantly increased risk of developing serious latent diseases, including but not limited to effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, and testicular and kidney cancer.

**Individual Plaintiffs With Property Damage Claims**

68.     Plaintiff Gregory Bell is an owner and occupant of real property in the Security Water District located at 270 Dix Circle, Colorado Springs, Colorado 80911. He has owned and occupied the property since July 2000. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.

69.     Plaintiff Jose Acevedo is an owner and occupant of real property located in the Security Water District at 4831 Pathfinder Drive, Colorado Springs, Colorado 80911, and also owns and formerly occupied property located at 335 O=Neil Court, Colorado Springs, Colorado 80911. He has occupied these properties since November 2014. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.

70.     Plaintiff Denise Durbin is an occupant of real property located in the Security Water District at 513 Aspen Drive, Colorado Springs, Colorado 80911. She is the natural mother and guardian of her daughters K. D. and B. D., both minors. Ms. Durbin and her daughters have occupied the property since October 2008. PFCs have entered the property, including but not limited to through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.

**Defendants**

71.     The term "Defendants" refers to all Defendants named herein jointly and severally.

i.     <u>The AFFF Defendants</u>

18

72. The term "AFFF Defendants" refers collectively to Defendants 3M Company, Amerex Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Chemguard Inc., Kidde-Fenwal, Inc., and Tyco Fire Products L.P.

73. Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

74. Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

75. Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

76. Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

77. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

78. On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

79. Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

80.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

81.     Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

82.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including but not limited to PFOA and PFOS.

83.     Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.

84.     On information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

85.     On information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.

86.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

87.     On information and belief, Buckeye designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

88.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

89.     Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

90.     On information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

91.     On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

92.     On information and belief, Chubb was acquired by Williams Holdings in 1997.

93.     On information and belief, Angus Fire Armour Corporation had previously been acquired by Williams Holdings in 1994.

94.     On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

95.     On information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

96.     On information and belief, Kidde P.L.C. was acquired by United Technologies Corporation in or around 2005.

97.     On information and belief, Kidde-Fenwal was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies Corporation.

98.     On information and belief, the Angus Fire and National Foam businesses separated from United Technologies Corporation in or around June 2013.

99.     On information and belief, Kidde-Fenwal is the entity that in June 2013 divested the AFFF business unit now operated by National Foam.

100.    Defendant Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

101.    On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde-Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde-Fenwal's design, manufacture, marketing, distribution, and sale of AFFF.

102.    On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Peterson Air Force Base and the Colorado Springs Municipal Airport, which share one property.

ii.     The Fluorosurfactant Defendants

103.    The term "Fluorosurfactant Defendants" refers collectively to Defendants 3M, Arkema Inc., ChemDesign Products Incorporated, Chemguard Inc., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours Inc., and Dynax Corporation.

104.    Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

105. On information and belief, beginning sometime in the early 1970s, the French chemical company Atochem designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

106. On information and belief, when Atochem's parent company, Elf-Acquitaine, merged with TotalFina in 1999 to form TotalFinaElf, the two companies combined their chemical operations to create Atofina S.A. ("Atofina"). On information and belief, Atofina continued to design, manufacture, market, distribute, and sell fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products..

107. On information and belief, Atofina sold its fluorosurfactant business to Dupont Chemical Solutions Enterprise in September 2002.

108. On information and belief, Arkema was created in October 2004 when TotalFinaElf spun off Atofina. On information and belief, Arkema is the successor in interest to Atofina and is legally responsible for the liabilities arising from the manufacture of fluorosurfactants used in AFFF by Atofina and its predecessors before September 2002.

109. Defendant ChemDesign Products Inc. ("ChemDesign") is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143.

110. On information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

111.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

112.    On information and belief, Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

113.    Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

114.    On information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

115.    On information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

116.    Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

117.    Defendant The Chemours Company ("Chemours Co.") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899.

118.    In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to

PFOS and PFOA and fluorosurfactants. On information and belief, Chemours Co. has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products.

119. On information and belief, Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015. From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

120. In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly-traded company.

121. Defendant The Chemours Company FC, LLC ("Chemours FC") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware, 19899.

122. Defendant Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

123. Defendant Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

124. On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

125.    Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

126.    On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

127.    Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

128.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

129.    Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

130.    On information and belief, DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

131.    On information and belief, 3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

132.    On information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or

their chemical precursors for use in AFFF/Component Products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Peterson Air Force Base and the Colorado Springs Municipal Airport, which share one property.

iii.  The PFC Defendants

133.  The term "PFC Defendants" refers collectively to 3M, AGC Chemicals Americas Inc., Archroma Management LLC, ChemDesign Products Inc., Chemicals, Inc., Clariant Corporation, Deepwater Chemicals, Inc., E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., DuPont de Nemours Inc., and Nation Ford Chemical Company.

134.  Defendant AGC Chemicals Americas, Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

135.  On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its a principal place of business in Tokyo, Japan.

136.  AGC manufactures specialty chemicals.  It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

137.  On information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

138.  Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

139.     On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").  On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

140.     On information and belief, Clariant designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

141.     Defendant Archroma Management LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its a principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

142.     On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

143.     On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

144.     Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

145.     On information and belief, Chemicals, Inc. supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

146.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

147.    On information and belief, Nation Ford supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

148.    On information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

149.    On information and belief, the PFC Defendants supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF/Component Products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Peterson Air Force Base and the Colorado Springs Municipal Airport, which share one property.

150.    Defendants represent all or substantially all of the market for AFFF/Component Products/Component Products at Peterson Air Force Base and the Colorado Springs Municipal Airport, which share one property.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

151.    In the 1940s, 3M began using a process called electrochemical fluorination ("ECF") to create carbon-fluorine bonds, which are key components of PFOA and PFOS. 3M soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M to develop a myriad of products that resist heat, stains, oil, and water. These

products included older forms of Scotchgard, which contained PFOS and when applied to fabric, furniture, and carpets protected against liquids and stains.

152.     Building on these earlier experiments, in the early 1960s 3M began developing firefighting foams containing PFOS to suppress flammable liquid fires, which cannot be effectively extinguished with water alone.

153.     AFFF is a Class-B fire-fighting foam that is mixed with water and used to extinguish fires that are difficult to fight, including those involving hydrocarbon fuels such as petroleum or other flammable liquids.

154.     AFFF is synthetically formed by combining fluorine free hydrocarbon foaming agents with surfactants.  When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel.  This film provides fire extinguishment and is the source of the designation "aqueous film forming foam."

155.     In the early 1960s, 3M and the United States Naval Research Laboratory developed AFFF to extinguish jet fuel fires, which are largely impervious to water, by smothering them. 3M's AFFF, which is produced through a patented 3M process known as ECF, contained PFOS.

156.     3M is the only manufacturer who used the ECF process, and therefore, produced the only AFFF that contained PFOS, as opposed to PFOA.

157.     Therefore, if PFOS is identified at a site where AFFF was used, the AFFF is a 3M product. Other formulations of AFFF manufactured by the non-3M Defendants are synthesized through a different process known as telomerization, and contain PFOA and other per- and polyfluoroalkyl substances, but not PFOS.

158.     3M also manufactured products that contained PFOA, and in 1951, 3M began selling its PFOA to other Defendants and chemical companies.

159.    Upon information and belief, by at least the 1970s, 3M knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

160.    In 1975, 3M concluded that PFOS was present in the blood of the general population. Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS. The finding also should have alerted 3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain the absorption of PFOS in blood from 3M's products.

161.    Upon information and belief, 3M concealed from its customers, the public and government regulators its knowledge of the risk of harm posed by PFOA and PFOS.

162.    In 1976, 3M found PFOA in the blood of its workers. This finding should have alerted 3M to the same issues raised by the findings regarding PFOS in the prior year.

163.    A 1978 study by 3M showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies by 3M in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

164.    Studies by 3M after the 1970s also showed adverse effects from exposure to PFOA and PFOS. In a 1983 study, for example, 3M found that PFOS caused the growth of cancerous tumors in rats.

165.    A study proposal by 3M in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

166.     A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. Upon information and belief, 3M's MSDSs for AFFF/Component Products did not provide similar warnings.

167.     In an attempt to limit liability, 3M opted to stop producing PFOS 2002 because it was aware of the looming chemical exposure and health effects on the public.

168.     Other companies, such as the Defendants listed herein, began manufacturing AFFF/Component Products using PFOA that they produced themselves or purchased from other companies.

169.     In or about 1977, Tyco/Ansul was also aware of the environmental and toxic concerns of its AFFF/Component Products and undertook a study and investigation on more environmentally improved AFFF.

170.     In 1991 Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

171.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M, DuPont Chemical Solutions Enterprise and Dynax Corporation, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver and pancreatic) in a second chronic cancer.

172.     Defendants voluntarily elected to include PFOA and/or PFOS in their AFFF/Component Products.

173.     Defendants knew or should have known that PFOA and PFOS are highly soluble in water, extremely mobile, persistent, and very likely to contaminate drinking water wells and present significant risks to human health and welfare if released into the environment.

174.     Nevertheless, Defendants manufactured, marketed, and sold their AFFF/Component Products with the knowledge that PFOS and PFOA would be released into the environment in firefighting training and rescue exercises, inadvertent releases, as well as in emergencies.

175.     Upon information and belief, instructions, labels and material safety data sheets were provided with the AFFF/Component Products by Defendants which, for significant time periods, did not fully describe the health and environmental hazards of AFFF/Component Products which Defendants knew or should have known at the time of distribution.

176.     Upon information and belief, Defendants knew of these health and environmental hazards for years yet failed to warn the users and other sensitive receptors, such as public water providers.

177.     Civilian and military airports, fire departments and industrial facilities, unaware of the environmental and health risk and hazards of using Defendants' AFFF/Component Products, used AFFF containing PFOA and PFOS for decades for firefighting and training. These sites have been linked to the widespread contamination of surface and groundwater, as well as public drinking water wells, with PFOA, PFOS, and other PFAS throughout the country.

178.     Federal law requires chemical manufacturers and distributors to immediately notify the USEPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

179. 3M did not comply with its duty under TSCA, and in April 2006, 3M agreed to pay the USEPA a penalty of more than $1.5 million for its failure to disclose studies regarding PFOA or PFOS and other per-fluoroalkyl substances dating back decades, among other things.

180. DuPont also did not comply with its duty under TSCA and the Resource Conservation and Recovery Act (RCRA), and in 2005 agreed to pay $10.25 million, the largest civil administrative penalty the USEPA had ever obtained to that date under any federal statute. The TSCA violations of Section 8(e) specifically addressed the company's failure to report to the USEPA the substantial risks of PFOA.

181. In 2001 AFFF/Component Products manufacturers, including DuPont and Dynax Corporation formed the Fire Fighting Foam Coalition.

182. The Fire Fighting Coalition made presentations to the EPA and various branches of the military stating and reassuring that the chemical used to replace PFOS were safe for human health and the environment and AFFF was the only way to safely protect military personnel from fires.

183. Upon information and belief, all Defendants knew or should have known that in its intended and/or common use, AFFF/Component Products containing PFOA or PFOS would very likely injure and/or threaten public health and the environment. On information and belief, this knowledge was accessible to all Defendants. For example, in 1970, a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. Upon information and belief, at least the following defendants are and/or were members of this trade association: 3M, Tyco/Ansul, Chemguard, and National Foam/Angus.

184. There is no natural sink for the Defendants' AFFF/Component Products containing PFOS and PFOA. Except for incineration above 10,000 degrees, Defendants' PFOS and PFOA

will eventually accumulate in the water and all living organisms - including the blood and organs of humans and livestock.

185. Plumes of PFOA and PFOS can persist in underground aquifers for many decades. Once the plume reaches a well, it continues to contaminate the water drawn from that well.

186. Defendants designed, manufactured and sold AFFF/Component Products that were used at PAFB.

187. AFFF/Component Products has a better fire-fighting capability than plain water due to the presence of fluorinated surfactants that lower the water's surface tension, essentially smothering the fire and starving it of its oxygen.

188. Some fluorinated surfactants have unique properties that cause some of the compounds to persist in the environment and toxically bioaccumulate in animals and humans.

189. AFFF/Component Products was introduced commercially in the mid-1960s and rapidly became the primary fire-fighting foam in the United States and in many parts of the world.

190. Unlike commercial AFFF/Component Products formulations, AFFF/Component Products sold to the United States military must conform to the military-specific performance and quality control measurements as prescribed by the military specification ("Mil-Spec") Mil-F-24385.

191. There was no requirement to use either PFOA or PFOS under Mil-F-24385.

192. Defendants 3M, TYCO/ANSUL, NATIONAL FOAM, CHEMGUARD and BUCKEYE were all on the DOD Qualified Products Listing ("QPL") as manufacturers certified to sell AFFF/Component Products under Mil-F-24385 at various times from 1976 through 2017.

193. Defendants 3M, TYCO/ANSUL, NATIONAL FOAM, CHEMGUARD and BUCKEYE designed, manufactured, and sold AFFF/Component Products that was used at PAFB.

194.    The United States Navy first used AFFF/Component Products in 1963, with the USAF commencing its use of AFFF/Component Products in 1970.

195.    In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water. AFFF/Component Products concentrates contain about 60-90% water and have a fluorine content of about 0.3-1.8%.

196.    The USAF uses 3% AFFF/Component Products for its installations.

197.    Fluorosurfactants used in 3M's AFFF/Component Products were produced by a unique and patented process known as electrochemical fluorination ("ECF"). The ECF process resulted in a product that contains PFOS, some of which degrades into PFOA.

198.    3M was the only company to manufacture PFOS-containing AFFF/Component Products.

199.    In an attempt to limit liability, 3M opted to stop producing PFOS in 2002 because it was aware of the widespread contamination and the health effects on the American public associated with exposure to the contamination.

200.    Like PFOS, PFOA is a man-made, manufactured chemical not found in nature. PFOA was used to make household and commercial products that resist heat and chemical reactions, and can be used to repel oil, stains, grease, and water.

201.    In 1947, 3M began producing PFOA via ECF.

202.    In 1951, 3M began selling its PFOA to other chemical companies, including DuPont.

203.    Other companies, including Defendants TYCO/ANSUL, BUCKEYE, NATIONAL FOAM, and CHEMGUARD, began manufacturing AFFF/Component Products using PFOA that they produced themselves or purchased from other companies. Defendants then sold

AFFF/Component Products to the USAF for use at installations across the country, including PAFB.

204.     The chemical structure of PFOA and PFOS make them resistant to breakdown or environmental degradation.  As a result, they are persistent when released into the environment.

205.     PFOA and PFOS have been found to bioaccumulate in humans and animals.  In 2005, the United States Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

206.     By the early 1960s, 3M knew that PFOA and PFOS were stable, persistent in the environment, and did not degrade.

207.     As a result of this persistence, they can remain in the environment, particularly in water, for many years and can move through air, soil, and into groundwater.

208.     Early studies showed that PFCs accumulated in the human body and were toxic.

209.     3M studies from the 1970s concluded that PFCs were "even more toxic" than previously believed.

210.     3M knew that PFOA is readily absorbed after consumption or inhalation, and it accumulates primarily in the blood stream, kidney, and liver.

211.     Upon information and belief, by the 1970s, 3M knew that PFOA and PFOS were widely present in the blood of the general U.S. population.  Upon information and belief, 3M concealed this knowledge from the public and government regulators, including those officials responsible for buying and supplying PAFB with AFFF/Component Products.

212.     In or about 1977, TYCO/ANSUL was also aware of the environmental and toxic effects of AFFF/Component Products and studied whether it could develop an AFFF/Component Products that produced less of an environmental impact.

213.     Because of PFOA's toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the USEPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95% no later than 2010.

214.     Human studies show associations between increased PFOA levels in blood and an increased risk of developing numerous serious medical conditions, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

215.     These injuries can arise months or years after exposure to PFOA.

216.     As alleged in paragraph 35, the adverse health effects observed following exposure to PFOS are the same as those observed with PFOA, meaning injuries associated with PFOS exposure and accumulation similarly manifest themselves months or years after the initial exposure.

217.     Given the extreme persistence of PFOS and PFOA in the environment, these chemicals' toxicity, mobility, and bioaccumulation potential has created an ongoing and concrete threat to the health of the residents in the Communities.

218.     Consumption of elevated levels of PFOA/PFOS from contaminated water will lead to elevated serum PFOA/PFOS levels with evidence that for every 10 parts per trillion (ppt) consumed from contaminated water, serum levels increase by 25%, thereby causing a doubling of serum levels at 40 ppt. Once biological uptake occurs, the clinical effect can be proximate to the exposure or following a latency or both.

219.     Given that the long-term health effects of PFOA/PFOS have not been exhaustively studied, and given that, based on studies that have been done, there is compelling evidence that

both malignant and nonmalignant effects result from PFOA/PFOS exposure, and because the full extent of latency of such effects has not yet been determined, period diagnostic medical exams for populations with PFOA/PFOS exposure from contaminated drinking water are reasonably necessary.Sustained exposure to PFOA/PFOS substantially increases the risk to the Plaintiffs and the Class Members of contracting the serious latent diseases alleged herein.

220.    As a result of the sustained exposure and substantial increased risk of contracting the serious latent diseases alleged herein, periodic medical examinations by qualified licensed medical professionals are both reasonable and necessary to permit early detection of latent disease in the Plaintiffs and the Class Members.

221.    Medical monitoring and testing protocols and procedures exist that make the early detection of the diseases correlated to the exposure to PFOA and PFOS possible and beneficial. These may included a comprehensive medical questionnaire completed by the patients, periodic and comprehensive medical examinations by qualified licensed medical professionals, and specific testing based on the patient's history, PFOA/PFOS exposure, symptoms, or health consequences, clinical considerations and/or medical examination results. Available laboratory testing includes but is not limited to testing of biomarker and organ system function.

222.    For the early detection of the latent diseases alleged herein, the qualified licensed medical professionals may utilize specific evaluations and/or laboratory testing of biomarker and organ system function as follow:

(a) Thyroid function:

      (1) Thyroid stimulating hormone (TSH); and

      (2) Free thyroxine (FT4)

(b) Liver function:

(1) Albumin;

(2) Aspartate Aminotransferase (AST/SGOT);

(3) Alanine Aminotransferase (ALT/SGPT);

(4) γ-glutamyltransferase (GGT);

(5) Bilirubin; and

(6) Alkaline Phosphatase

(c) Uric Acid:

(1) Serum

(d) Kidney Cancer:

(1) Urinalysis

(e) Lipids:

(1) Total cholesterol;

(2) High-density lipoprotein (HDL);

(3) Low-densitylipoprotein (LDL); and

(4) Total triglycerides

(f) Evaluation for testicular cancer:

(1) Scrotal ultrasound followed by radiographic testing, measurement of serum

tumor markers;

(2) Radical inguinal orchiectomy; and/or

(3) Retroperitoneal lymph node dissection

(g) Evaluation for kidney cancer:

(1) Urine culture;

(2) Ultrasound of kidneys;

(3) Abdominal pelvic CT scan; and/or

(4) Cystoscopy

(h) Reproductive/infertility issues:

(1) Evaluation by a fertility specialist if, after 12 months, a couple has failed to conceive

(i) Gestational hypertension:

(1) Screening for evidence of gestational hypertension and pre-eclampsia for women in their second and third trimesters of pregnancy

(j) Androgen dysregulation:

(1) Evaluations to assess androgen levels

(k) Indications of ulcerative colitis:

(1) Evaluation of erythrocyte sedimentation rate;

(2) Evaluation of serum C-reactive protein; and/or

(3) Colonoscopic evaluation

223.    Using the data collected from comprehensive medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, as alleged herein, qualified licensed medical professionals may predict, detect, and treat these diseases early, thus benefiting the Plaintiffs and Class Members and reducing the likelihood of their premature morbidity, disability, or mortality.

**Background of PFOA and PFOS and the Known Risk to Groundwater**

224.    PFAS are chemical compounds containing fluorine and carbon atoms. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

225. The two most widely studied types of these substances are PFOA and PFOS, which each contain eight carbon atoms.

226. PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals. Because PFOA and PFOS have these properties, they pose significant threats to public health and the environment.

227. PFOA and PFOS easily dissolve in water, and thus they are mobile and readily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

228. PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable and they resist degradation due to light, water, and biological processes.

229. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

230. PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

231. Additionally, PFOA and PFOS biomagnify up the food chain, such as when humans eat fish that have ingested PFOA or PFOS.

232. The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

233. Exposure to PFOA and PFOS can be toxic and may pose serious health risks to humans and to animals.

**Evolution of Regulatory Study on the Health Effects of PFOS and PFOA Exposure**

234. As discussed above, neither 3M nor, upon information and belief, the other Defendants, complied with their obligations to notify the USEPA about the "substantial risk of injury to health or the environment" posed by their AFFF/Component Products containing PFOA/S. See TSCA § 8(e).

235. In or around 1998, USEPA began investigating the safety of PFOA and PFOS after some limited disclosures by 3M and others.

236. Some PFCs, such as PFOS and PFOA, have been found to bioaccumulate in humans and animals. In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

237. Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the USEPA PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

238. The recommendations in USEPA's health advisories evolved as the USEPA learned more about PFOA and PFOS.

239. On January 8, 2009, the USEPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS), *available at https://www. cpa.gov/sites/productionlfiles/2015 0-9/documents/pfoa- pfos-provisional.pdf*, at p. 1, n. 1 (last visited June 5, 2018).

240. Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

241. The C8 Science Panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the Panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

242. Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

243. The associated diseases can arise months or years after first exposure to PFOS and PFOA.

244. Even after the C8 Science Panel publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of one PFAS, PFOA, in drinking water for one year or

more had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFAS in human blood.

245. In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[9]

246. On or around May 19, 2016, the USEPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt. See Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33, 250-51 (May 25, 2016).

---

[9] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

247. In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and USEPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

## **AFFF/Component Products Usage at Peterson Air Force Base and the Colorado Springs Municipal Airport**

248. Upon information and belief, Defendants each manufactured AFFF/Component Products containing PFCs that were sold to the DOD or the USAF with knowledge that AFFF would be used in training operations and for emergency fire-fighting situations.

249. Upon information and belief, Defendants' AFFF/Component Products were sold to and used at PAFB.

250. At any given time, the Defendants were responsible for the design, manufacture, and sale of thousands of gallons of AFFF concentrate used and stored at PAFB.

251. The AFFF was expected to and did reach PAFB without substantial change in the condition in which the Defendants sold it.

252. For decades, USAF personnel used AFFF designed, manufactured, and sold by each of the Defendants for training operations at the PAFB, including fire-fighting and explosion training.

253. Due to these training operations, AFFF was released into the surrounding air, soil, and groundwater at locations including but not limited to the current fire training area ("FTA") (1991 to date), the former FTA known as Site 5 (1960 through 1977), and the former FTA known as Site 8 (1977 to 1991).

254. AFFF was additionally introduced into the groundwater via aircraft hangers containing fire suppression systems that used AFFF. During function testing or false alarms,

AFFF was permitted to enter the air, soil, and groundwater, further contaminating Plaintiffs' drinking water.

255.    At PAFB, two fire stations conduct spray testing with AFFF, releasing AFFF into the soil, air, and groundwater.

256.    In November 2016, the U.S. Army Corps of Engineers published "Revised Final Preliminary Assessment Report for Perfluorinated Compounds at Peterson Air Force Base," a report that confirmed the use of AFFF at PAFB and identified fire training areas at PAFB as possible sources of PFC contamination of the Communities' groundwater supply.10

257.    As a direct and proximate result of the failure to warn the USAF, PAFB, or the surrounding Communities, including those most sensitive to contamination, AFFF and its constituents were permitted to enter the air, soil, and groundwater, ultimately entering the Plaintiffs' and the Putative Classes' bodies and properties.

258.    Upon information and belief, instructions, warning labels, and material safety data sheets that Defendants provided with their AFFF/Component Products did not reasonably nor adequately describe the health and environmental hazards of AFFF/Component Products that Defendants knew or should have known.

## CLASS ACTION ALLEGATIONS

259.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

260.    Plaintiffs bring this action as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed sub-classes and seek to certify and

---

10 Revised Preliminary Assessment Report, *supra*, note 4.

maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery as follows:

a. **Medical Monitoring Class**: Individuals who received water provided by their municipal water supplier, smaller water systems, or domestic water supply wells in the CDPHE Areas of Investigation ("Medical Monitoring Class"). This Class is composed of the following sub-classes:

> a. All individuals who reside or resided within the CDPHE Areas of Investigation who received water provided by the Security Water and Sanitation District (the "Security Water Sub-Class");
>
> b. All individuals who reside or resided within the CDPHE Areas of Investigation who received water provided by the Widefield Water and Sanitation District (the "Widefield Water Sub-Class");
>
> c. All individuals who reside or resided within the CDPHE Areas of Investigation who received water provided by the City of Fountain Utilities Department (the "Fountain Water Sub-Class"); and
>
> d. All individuals who reside or resided within the CDPHE Areas of Investigation who received water from smaller water systems or domestic water supply wells (the "Private Water Sub-Class").

b. **Property Damage Class**:

261. Individuals who own real property in the CDPHE Areas of Investigation serviced by the three water districts, Fountain, Security, and Widefield, or those who have private water wells in the CDPHE investigative areas ("Property Damage Class"). This class can be readily ascertained by Census data, property records, and county records.

262. Plaintiffs are members of the proposed Sub-Classes they seek to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

263. Excluded from the Classes are:

> i. Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representatives, employees, officers,

directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

 ii. The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

 iii. Any Class counsel or their immediate family members; and

 iv. All governmental entities.

264. Plaintiffs reserve the right to amend the Class and Sub-Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional sub-classes, or modified in any other way.

## Numerosity and Ascertainability

265. This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because the number of impacted individuals in the CDPHE Areas of Investigation and property owners, upon information and belief, have reached the thousands, making individual joinder of Class Members' respective claims impracticable. While the exact number of Class Members is not yet known, a precise number can be ascertained from objective criteria such as U.S. Federal Census records, the State of Colorado, and the public records of the municipal entities, and through other appropriate discovery. The resolution of the claims of the Class Members in a single action will provide substantial benefits to all parties and ease the administrative burden on the Court. It is expected that the Class Members will number in the tens of thousands.

266. Finally, Class Members can be notified of the pendency of this action by Court-approved notice methods.

## Typicality

267. Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Class Members, have been damaged by Defendants' misconduct in that they

have incurred damages and losses related to the introduction of PFOA, PFOS, and other PFCs into the municipal water supplies operated in the CDPHE Areas of Investigation as well as private wells in the area, causing personal injury and property damages.

268.  Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members.  The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

**Adequacy of Representation**

269.  Plaintiffs will serve as fair and adequate class representatives because their interests, as well as the interests of their counsel, do not conflict with the interests of other members of the Class they seek to represent.

270.  Further, Plaintiffs have retained counsel competent and well experienced in class action and environmental tort litigation.

271.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel has interests adverse to the Class.

**Predominance of Common Issues**

272.  There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, making it appropriate to bring this action under Rule 23(b)(3).  The answers to these common questions will advance resolution of the litigation as to all Class Members. Common legal and factual issues include:

a)  Whether Defendants engaged in the conduct alleged herein;

b) Whether Defendants knew or should have known that exposure to PFOA and PFOS could increase health risks;

c) Whether Defendants knew or should have known that manufacturing AFFF/Component Products containing PFOA and PFOS was unreasonably dangerous;

d) Whether Defendants knew or should have known that PFOA and PFOS were persistent, stable, and mobile chemicals that were likely to contaminate groundwater water supplies;

e) Whether Defendants failed to sufficiently warn of the potential for harm that resulted from the use of their products;

f) Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS and failed to warn users, Plaintiffs, and the Class of same;

g) The extent to which Defendants knew about the PFOA and PFOS contamination in the groundwater in the CDPHE Areas of Investigation, including the water supply systems and private wells of residents in the Communities;

h) Whether the Defendants owed a duty to Plaintiffs and the Classes to refrain from the actions that caused the contamination of the drinking water with PFOA and PFOS;

i) Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFOA and PFOS;

j) For the Medical Monitoring Class, whether Plaintiffs and Class Members were exposed to water containing elevated levels of PFOA and PFOS while living in Security, Widefield, and Fountain;

k) For the Property Damage Class, whether the PFOA and PFOS contamination caused and continues:

    1. To cause a continuous invasion of the property rights of the Plaintiffs and Class such that the property values within the CDPHE Areas of Investigation have and/or continue to decline in value following the disclosure of the PFOA and PFOS contamination;

    2. To substantially interfere with Plaintiffs' and the Class' use and enjoyment of their property;

l) Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount;

m) Whether the members of the Classes and Sub-Classes have sustained damages and the proper measure of damages;

n) Whether Defendants are strictly liable to Plaintiffs and the Class for their actions; and

o) Whether Defendants are liable to Plaintiffs and the Class for their actions.

**Superiority**

273.     The class action mechanism is superior to any other available means of fairly and efficiently adjudicating this case. Given that the CDPHE Areas of Investigation consist of a great number of individuals impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to litigate their respective claims individually due to the risk of producing inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism minimizes prospective management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

**AFFF/COMPONENT PRODUCTS CONTAINING PFOA AND PFOS ARE FUNGIBLE AND COMMINGLED IN THE GROUNDWATER**

274.     Once AFFF/Component Products containing PFOA and PFOS has been released into the environment, it lacks characteristics that would otherwise enable the identification of the company that manufactured that particular batch of AFFF/Component Products.

275.     Decades of manufacturing, selling, and distributing AFFF/Component Products has created  complex and opaque arrangements whereby Defendants regularly contract with multiple entities, including the DOD, the USAF, specific installations, and/or third-party logistic intermediaries, to sell and deliver AFFF/Component Products to bases throughout the country, including to PAFB.

276.     A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF/Component Products coming from different manufacturers.

277.     At PAFB, AFFF/Component Products from different manufacturers was used at multiple training sites over the course of many years, rendering it impossible for investigators to identify with any certainty the exact AFFF/Component Products product that produced the PFOA or PFOS at issue.

278.     Even if investigators could track the source of a subsurface plume to a single location at PAFB, it would be impossible to identify how an individual Defendants' AFFF/Component Products contributed to the contamination because of how AFFF/Component Products was used, stored, and disposed of at those locations.

279.     The case at PAFB is typical of PFOA and PFOS contamination cases generally: even though several areas were located at PAFB where the AFFF/Component Products was used and entered the groundwater, neither the federal or state investigators could determine which manufacturers' AFFF/Component Products containing PFOA and PFOS had contributed to the resulting groundwater contamination plume.

280.     PFOA and PFOS is present in all Defendants' AFFF/Component Products products.

281.     Because precise identification of the manufacturer of the specific AFFF/Component Products that was the source of PFOA and PFOS found in a Class Members' blood and groundwater is impossible, and the market for AFFF/Component Products is ascertainable, Plaintiffs must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiffs and the Class.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

282.     Upon information and belief, Defendants in this action are manufacturers that control a substantial share of the market for AFFF/Component Products containing PFOA and

PFOS in the United States and are jointly responsible for the contamination of the groundwater in the Communities and for causing the damages and injuries complained of in this Complaint.

283. Each of these Defendants participated in a state-wide and national market for AFFF/Component Products containing PFOA and/or PFOS during the relevant time.

284. Market share liability attaches to all Defendants and the liability of each should be assigned according to each Defendant's percentage share of the market for AFFF/Component Products -containing PFOA and/or PFOS at issue in this Complaint. As alleged in paragraphs 155-163, PFOA and PFOS is fungible; it is impossible to identify the exact Defendant who manufactured the particular AFFF/Component Products containing PFOA and/or PFOS that have contaminated the air, soil or groundwater.

285. The relevant product and geographic market can be defined in this instance because the market for AFFF/Component Products produced pursuant to military specifications consists of only one buyer, PAFB via the USAF, who used this product for only one purpose, to fight fires.

286. The market for AFFF/Component Products produced in accordance with military specifications is ascertainable through standard discovery means.

287. It would be unfair to require Plaintiffs and the Class to bear the entire cost of their injuries simply because it is inherently impossible for the Plaintiffs to identify the exact Defendant that has manufactured the product that has contaminated the water supply and gives rise to the injuries complained of in this action.

288. Alternatively, concert of action liability attaches to all Defendants based on their participation in a common plan to commit the torts alleged herein and each of which acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF/Component Products containing PFOA and PFOS.

289. Alternatively, as a result of Defendants' participation in the military grade fire-fighting foam industry through the production, sale, and distribution of AFFF/Component Products containing PFOA and PFOS pursuant to military specifications, enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

## CONSPIRACY

[The Court dismissed Plaintiffs' Fifth Cause of Action: Civil Conspiracy without prejudice pursuant to its Order dated September 25, 2018. *See* ECF No.326].

## CAUSES OF ACTION FOR CLASS ACTION AND INDIVIDUAL CLAIMS

## AS AND FOR A FIRST CAUSE OF ACTION: NEGLIGENCE

290. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

291. This cause of action is brought pursuant to Colorado law.

292. Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to human health.

293. Given that Defendants were aware of these chemicals' potential for bioaccumulation in humans as well as the links to numerous serious medical conditions, including cancer, Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF/Component Products containing PFOA and PFOS would be hazardous to human health.

294. Defendants knew or should have known that PFOA and PFOS are highly soluble in water, highly mobile, extremely persistent in the environment, and therefore high likely to contaminate water supplies if released into the environment.

295.     Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF/Component Products containing PFOA and PFOS would result in the contamination of the municipal and private well drinking water supplies of the Communities given their proximity to PAFB.

296.     Defendants marketed and sold their products with knowledge that AFFF containing PFOA and PFOS would be used in training exercises and in emergency fire-fighting situations at military bases and airports, including PAFB, in such a manner that these dangerous chemicals would be released into the environment.

297.     Defendants marketed and sold their products with knowledge that AFFF containing toxic PFCs would be stored in fire suppressant systems and tanks on USAF Bases and at airports, including PAFB, and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the environment.

298.     Knowing of the dangerous and hazardous properties of AFFF/Component Products, and the manner in which AFFF would be used, stored, and maintained at PAFB, it was foreseeable that AFFF would contaminate the surrounding environment, groundwater, and drinking water supplies of Fountain, Security, and Widefield, as a result of the Communities' proximity to PAFB.

299.     Defendants therefore knew or should have known that safety precautions would be required to prevent the release of PFOA and PFOS into the surrounding groundwater and drinking water supplies.

300.     Given the foreseeability of AFFF's release into the surrounding Communities' drinking water, Defendants should have acted reasonably by not placing inherently dangerous AFFF/Component Products into the marketplace.

301.     Though AFFF is effective at extinguishing otherwise difficult to fight fires, the potential for widespread and persistent contamination of municipal and private well water supplies with chemicals linked to the development of numerous serious medical conditions far outweighs any social utility gained from AFFF's fire-fighting ability.

302.     The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiffs and the Class was minimal, as the practical consequences of placing this burden on the Defendants amounted to providing adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

303.     As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

304.     Considering the factors related to risk, foreseeability, social utility, the burden of guarding against the harm, and the practical consequences of placing that burden on the Defendants, the Defendants therefore owed multiple cognizable duties to Plaintiffs and the Class.

305.     Defendants had a duty to warn of the hazards associated with AFFF/Component Products containing PFOA and PFOS entering and poisoning the environment and groundwater.

306.     As manufacturers, marketers, and sellers of AFFF/Component Products, Defendants owed Plaintiffs and the Class a duty to exercise reasonable care and ensure that AFFF/Component Products were manufactured, marketed, and sold in such a way that the end users of AFFF were aware of the potential harm PFOA and PFOS could cause to human health and the environment.

307.     Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to warn and notify Plaintiffs and the Class of the release of the contaminants

before they injured Plaintiffs, the Class, and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

308.    As such, the Defendants, acting negligently, recklessly, willfully, wantonly, and/or intentionally, breached their legal duties to Plaintiffs and the Class, causing the contamination of the municipal and private well drinking water supplies in and around the residences of Plaintiffs and the Class.

309.    Defendants breached their duty to warn and notify end users of AFFF/Component Products about the danger that PFOA and PFOS could enter into the environment and groundwater.

310.    Defendants breached their duty to warn by failing to notify Plaintiffs and the Class in a timely manner that PFOA and PFOS had contaminated the municipal and private well drinking water supplies.

311.    Defendants breached their duty not to contaminate the Plaintiffs' and Class Members' drinking water supplies by allowing PFOA and PFOS to be released into the municipal and private well drinking water supplies of Fountain, Security, and Widefield.

312.    Defendants breached their duties to act reasonably by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

313.    Defendants' breaches of their duties were direct and proximate causes of the drinking water in both the municipal and private well supplies to become contaminated with unsafe and dangerous levels of PFOA and PFOS.

314.    Defendants' breaches of their duties were direct and proximate causes of the injuries, damages, and harm the Plaintiffs and the Classes have suffered to their health and

property. Defendants' breach of their duties to act reasonably and to timely notify and warn the Communities of the presence of PFOA and PFOS in the groundwater directly and proximately prevented Plaintiffs and the Class from undertaking effective and immediate remedial measures.

315. Plaintiffs and the Class have expended and/or will be required to expend significant financial resources to test and monitor for the presence of latent diseases for many years because of Defendants' conduct.

316. Plaintiffs and the Class have expended and/or will be required to expend significant financial resources to remediate the effects of Defendants' conduct on their homes and property for many years.

317. Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of Defendants' breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Class, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

318. Accordingly, Plaintiffs and the Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from injuries to their persons and property, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, and nominal damages, flowing from the negligence that are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

## AS AND FOR A SECOND CAUSE OF ACTION: MEDICAL MONITORING

319.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

320.     This cause of action is brought pursuant to Colorado law.

321.     In Colorado, a claim for medical monitoring requires a Plaintiff to establish that: (1) Plaintiff has suffered a significant exposure to a hazardous substance through the tortious actions of defendant; (2) as a proximate result of this exposure, Plaintiff suffers from an increased risk of contracting a serious latent disease; (3) that increased risk makes periodic diagnostic medical examinations reasonably necessary; and (4) monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.[11]

322.     Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF/Component Products containing PFOA and PFOS would result in the contamination of the municipal and private well drinking water supplies of Fountain, Security, and Widefield, due to these communities' proximity to PAFB.

323.     Defendants knew or should have known that exposing humans to PFC-contaminated water would be hazardous to human health and the environment.

324.     Years of consuming PFC-contaminated water has exposed the Plaintiffs and the Classes to PFOA, PFOS, and potentially other toxic substances as a result of the use, storage, and discharge of AFFF/Component Products at PAFB.

325.     As alleged in this Complaint, given the persistence and bioaccumulative nature of PFOA and PFOS, PFOA and PFOS exposure leads to the bioaccumulation of PFOA and PFOS in the blood of humans exposed to water contaminated with PFOA and PFOS.

---

[11] *See Cook v. Rockwell International Corp.*, 755 F. Supp. 1468, 1477 (D. Colo. 1991).

326.     As alleged in paragraph 136 herein, consumption of elevated levels of PFAS from contaminated water will lead to elevated serum PFOA/PFOS levels with evidence that for every 10 parts per trillion consumed from contaminated water, serum levels increase by 25% thereby causing a doubling of serum levels at 40 ppt.  Once biological uptake occurs the impact can be proximate to the exposure or following a latency or both.

327.     As alleged in paragraphs 132 and 138 herein, sustained exposure to PFOA/PFOS substantially increases the risk to the Plaintiffs and the Class Members of contracting numerous serious latent diseases.  These latent disease include but are not limited to: kidney cancer; testicular cancer; ulcerative colitis; thyroid disease; pregnancy induced hypertension (including preeclampsia); and hypercholesterolemia.

328.     Periodic medical examinations by qualified licensed medical professionals are both reasonable and necessary to detect the latent disease in the Plaintiffs and the Class Members due to their years of exposure to the PFOA/PFOS contaminated water and the substantial increased risk of contracting the serious latent diseases alleged herein.

329.     As alleged in paragraphs 140-142 herein, medical monitoring and testing protocols and procedures exist that make the early detection of the diseases correlated to the exposure to PFOA and PFOS possible and beneficial. By using the medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, qualified licensed medical professionals may predict, detect, and treat diseases early, thus benefiting the Plaintiffs and Class Members and reducing the likelihood of their premature morbidity, disability, or mortality.

330. For the early detection of latent diseases in the Plaintiffs and Class Members, qualified licensed medical professionals may utilize the specific evaluations and/or laboratory testing of biomarker and organ system function as set forth in paragraph 141 herein.

331. As a proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered an injury—the quantifiable costs of periodic diagnostic medical examinations and testing for the early detection of serious latent diseases. Plaintiffs and Class Members request that the Court require Defendants to fund a Court-supervised medical monitoring plan that provides for periodic medical examinations and testing of Plaintiffs and the Class for the latent diseases caused by exposure to PFOA and PFOS, as well as payment of their attorneys' fees and expenses. Plaintiffs and the Class also request that the Court appoint a plan administrator and reserve jurisdiction to enforce the terms of the plan.

## AS AND FOR A THIRD CAUSE OF ACTION: STRICT PRODUCTS LIABILITYFAILURE TO WARN

332. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

333. This cause of action is brought pursuant to Colorado law.

334. As commercial manufacturers, sellers, and distributors of AFFF/Component Products, Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to human health and the environment.

335. Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF/Component Products containing PFOA and PFOS was hazardous to human health and the environment.

336. Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF/Component Products containing PFOA and PFOS

would result in the contamination of the Communities' municipal and private well water supplies as a result of the Communities' proximity to PAFB.

337.    AFFF's persistence, mobility, bioaccumulative potential, and PFOA's and PFOS' links to numerous serious medical conditions, are not open and obvious conditions.

338.    Though Defendants knew or should have known about the seriousness of the consequences of failing to warn about the inherent dangers associated with AFFF/Component Products containing PFOA and PFOS, Defendants failed to warn PAFB of the dangers inherent in the use of the product.

339.    Though Defendants knew or should have known about the reasonably foreseeable hazards to human health and welfare associated with the use of AFFF/Component Products containing PFOA and PFOS in the vicinity of Plaintiffs' drinking water supplies, including contamination of public drinking water and private wells with PFOA and PFOS, Defendants failed to provide adequate warnings of, or take any precautionary measures to mitigate, those hazards.

340.    Defendants failed to provide sufficient warning that the use and storage of Defendants' product would cause the product to be released into the environment and cause the PFOA and PFOS contamination of the environment, groundwater, and drinking water.

341.    Adequate instructions and warnings on the AFFF/Component Products could have reduced or avoided these foreseeable risks of harm to Plaintiffs, the Class, and their properties.

342.    Had Defendants provided adequate warnings, Plaintiffs and the Class could have taken measures to avoid or lessen their exposure.

343. Had Defendants provided adequate warnings, PAFB could have taken measures to reduce or prevent the release of PFOA and PFOS into the environment, groundwater, and drinking water.

344. Defendants' failure to provide adequate and sufficient warnings for the AFFF/Component Products that they manufactured, marketed, and sold renders the products defective.

345. Defendants' failure to warn was a direct and proximate cause of the environmental and health impacts from PFOA and PFOS that came from the use, storage and disposal of AFFF at PAFB.

346. Defendants' failure to warn was the direct and proximate result of the contamination, leading to the diminution in the value and marketability of the properties of the Plaintiffs and Property Damage Class Members. Plaintiffs and the Class have suffered the need for and the cost of remediation of their properties and mitigation systems for those properties, and the cost of alterative water.

347. As a result of the contamination, Plaintiffs and the Class have lost use and enjoyment of their properties and have suffered annoyance, discomfort, and inconvenience as a consequence of the contamination of their properties by Defendants.

348. As a result of Defendants' conduct and the resulting contamination, Plaintiffs and the Classes have been injured in that their exposure to PFOA, PFOS, and potentially other toxic substances has produced an increased level of PFOA and PFOS in their blood stream, leading to the bioaccumulation of PFOA and PFOS in their bodies and significantly increasing their risk of developing numerous serious medical conditions.

349.    As a result of Defendants manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to Plaintiffs and Class Members.

350.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

## AS AND FOR A FOURTH CAUSE OF ACTION: STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN

351.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

352.    This cause of action is brought pursuant to Colorado law.

353.    By virtue of manufacturing, marketing, and selling AFFF/Component Products containing PFOA and PFOS, Defendants had a strict duty not to place an unreasonably dangerous product into the stream of commerce that would injure innocent bystanders in the Communities.

354.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health when it, or products containing it, were used in their foreseeable and intended manner.

355.    The chemical makeup of AFFF and the PFOA and PFOS underlying the product's hazardous characteristics involve the interpretation of technical, scientific information derived from research and testing.

356.    Knowing of the dangerous and hazardous properties of AFFF/Component Products due to research and testing, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF/Component Products that did not contain PFOA or PFOS.

357.    These alternative designs and/or formulations were already available, practical, and technologically feasible.

358. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to persons and property resulting from Defendants' manufacture, marketing, and sale of AFFF/Component Products containing PFOA or PFOS.

359. As manufacturers of AFFF/Component Products, Defendants not only had the ability to alter the product in such a way that maintained the fire-fighting abilities of the product while eliminating its inherently unsafe character, but also were in the best position to do so.

360. AFFF's persistence, mobility, bioaccumulative potential, and PFOA's and PFOS' links to numerous serious medical conditions, are not open and obvious conditions or part of general public knowledge of AFFF/Component Products.

361. Therefore, even though AFFF is useful for fighting hard to fight fires, the inherent risks associated with its use far outweigh any fire-fighting benefits, thereby rendering the AFFF/Component Products unreasonably dangerous.

362. The manufacture, sale, and distribution of unreasonably dangerous AFFF/Component Products renders the Defendants' product defective.

363. Defendants' defective design and formulation of AFFF/Component Products is the direct and proximate cause of the environmental and health impacts from PFOA and PFOS.

364. As a result of Defendants' defective design and formulation of AFFF/Component Products, the resulting contamination, the value and marketability of the Plaintiffs' and Property Damage Class' property has been and will continue to be diminished. Plaintiffs and the Class Members have suffered the need for and the cost of remediation of their properties and/or mitigation systems for those properties, and the cost of alterative water.

365. As a direct result of the contamination, Plaintiffs and the Class Members have lost the use and enjoyment of their properties and have suffered annoyance, discomfort, and inconvenience as a consequence of the contamination of their properties by Defendants.

366. As a direct result of Defendants' defective design and formulation of AFFF/Component Products, the Plaintiffs and the Classes have been injured in that their exposure to PFOA, PFOS, and potentially other toxic substances has caused them to develop numerous serious medical conditions associated with this exposure as more fully described herein and has significantly increased their risk of developing those conditions.

367. As a direct result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to the Plaintiffs and Class Members.

368. Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

## AS AND FOR A FIFTH CAUSE OF ACTION: CIVIL CONSPIRACY

[The Court dismissed Plaintiffs' Fifth Cause of Action: Civil Conspiracy without prejudice pursuant to its Order dated September 25, 2018. *See* ECF No.326].

## AS AND FOR A SIXTH CAUSE OF ACTION
### Violation of the "Colorado Uniform Fraudulent Transfer Act"
**(E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)**

369. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

370. Plaintiffs seek equitable and other relief pursuant to the Colorado Uniform Fraudulent Act (CUFTA) as adopted by the State of Colorado, against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively the CUFTA Defendants). C.R.S. § 38-8-101, et seq.

371.     Under the CUFTA: "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (II) Intended to incur or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. C.R.S. § 38-8-105.

372.     The CUFTA Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

373.     CUFTA Defendants engaged in acts in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of parties such as Plaintiffs that have been damaged as a result of the CUFTA Defendants' conduct, omissions, and actions described in this Complaint.

374.     It is primarily E. I. DuPont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF/Component Products containing PFAS and PFAS with the superior knowledge that they were toxic, mobile,

persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate the Plaintiff's drinking water supply and injure the Plaintiffs.

375.    As a result of the transfer of assets and liabilities described in this Complaint, the CUFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF/Component Products containing PFAS and PFAS.

376.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. DuPont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF/Component Products containing PFAS and/or PFAS.

377.    The CUFTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. DuPont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

378.    At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

379.    Pursuant to C.R.S. § 38-8-101, et seq. Plaintiffs seek avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to the CUFTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

380.    Plaintiffs further seek all other rights and remedies that may be available to it under CUFTA, including prejudgment remedies as available under applicable law, as may be necessary

to fully compensate Plaintiffs for the damages and injuries they have suffered as alleged in this Complaint.

## CLAIM FOR PUNITIVE DAMAGES

381. Plaintiffs and the Class hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

382. Plaintiffs and the Class assert a claim for punitive damages under C.R.S. § 13-21-102.

383. Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that was done without regard to the consequences or the safety of the Plaintiffs and the Class and caused the foregoing property damage, and injuries upon the persons and properties of Plaintiffs and the Class, disregarding their protected rights.

384. Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure Plaintiffs and the Class in the Communities did not ingest PFOA and PFOS, which Defendants knew were linked to numerous serious medical conditions.

385. Defendants have caused significant harm to Plaintiffs and the Class, including harm to the properties and water supplies of Plaintiffs and the Class and have demonstrated a conscious and outrageous disregard for their safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and the Class demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.     an award certifying the Sub-Classes;

B.    a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and Class Members;

C.    an order requiring that Defendants implement a testing and monitoring protocol to test each property and its drinking water for the properties belonging to the members of the Property Damage Class and, where appropriate, to implement appropriate remedial measures;

D.    an order establishing a medical monitoring protocol for Plaintiffs and the Class;

E.    an award to Plaintiffs and the Class of general, compensatory, exemplary, consequential, nominal, and punitive damages;

F.    an order for an award of attorneys' fees and costs, as provided by law;

G.    an award of pre-judgment and post-judgment interest as provided by law; and

H.    an order for all such other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of any and all issues in this matter so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated: September 25, 2020                    Respectfully Submitted,

**NAPOLI SHKOLNIK, PLLC**

*/s/ Patrick J. Lanciotti*
Patrick J. Lanciotti
Paul J. Napoli
Louise Caro
360 Lexington Avenue, Eleventh Floor
New York, NY 10017
Telephone: (212) 397-1000
E-mail: planciotti@napolilaw.com
E-mail: pnapoli@napolilaw.com
E-mail: lcaro@napolilaw.com

**BURG SIMPSON**

**ELDREDGE HERSH & JARDINE, P.C.**
David P. Hersh
40 Inverness Drive East
Englewood, CO 80112
Telephone: (303) 792-5595
Facsimile: (303) 708-0527
E-mail: dhersh@burgsimpson.com

*Lead Counsel for Plaintiffs and the Putative
Classes*


**MCDIVITT LAW FIRM**
Michael McDivitt
David McDivitt
19 East Cimarron Street
Colorado Springs, CO 80903
Telephone: (719) 471-3700
E-mail: mmcdivitt@mcdivittlaw.com
E-mail: dmcdivitt@mcdivittlaw.com